UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| ZAINAL ~~ZANIAL~~ SALEH, | ) |
| | ) |
| Defendant. | ) |

No. 4:17 CR 00234 RLW

## GUILTY-PLEA AGREEMENT

Come now the parties and hereby agree, as follows:

## 1. PARTIES:

The parties are the defendant, ~~ZANIAL~~ SALEH, represented by defense counsel, Joseph Neill, and the United States of America, represented by the United States Attorney's Office for the Eastern District of Missouri. This agreement does not, and is not intended to, bind any governmental office or agency other than the United States Attorney Office for the Eastern District of Missouri (hereinafter USAO). The Court is neither a party to nor bound by this agreement.

## 2. GUILTY PLEA:

Pursuant to Rule 11(c)(1)(A), Federal Rules of Criminal Procedure, in exchange for defendant's voluntary plea of guilty to the offense of conspiracy to distribute and to possess with intent to distribute controlled substances and analogue controlled substances under count II, no further federal prosecution will be brought in this District relative to the defendant's involvement in the conspiracy to distribute and to possess with intent to distribute controlled substances and

analogue controlled substances intended for human consumption between January 1, 2015 and May 23, 2017 of which the USAO is aware at this time.

The parties also agree that the U. S. Sentencing Guidelines Total Offense Level analysis agreed to by the parties herein is the result of negotiation and led, in part, to the guilty plea. The parties further agree that neither party may request a sentence above or below the U.S. Sentencing Guidelines range (combination of Total Offense Level and Criminal History Category) ultimately determined by the Court pursuant to any chapter of the Guidelines and Title 18, United States Code, Section 3553(a).

## 3. ELEMENTS:

### a. Count II:

As to Count II, the defendant admits to knowingly violating Title 21, United States Code, Section 841(a)(1) and 846, and admits there is a factual basis for the plea, and further fully understands that the elements of the crime are the following:

1.    Sometime between 2014 and May 2017, the defendant and other persons reached an agreement or came to an understanding to knowingly distribute and to knowingly possess with intent to distribute controlled substances and analogue controlled substances intended for human consumption;

2.    The defendant voluntarily and intentionally joined in the agreement or understanding, either at the time it was first reached or at some later time while it was still in effect; and

3.    At the time the defendant joined in the agreement or understanding, he knew of the purpose of the agreement or understanding.

2

## 4. FACTS:

The parties agree that the facts in this case are as follows and that the USAO would prove these facts beyond a reasonable doubt if the case were to go to trial. These facts may be considered as relevant conduct pursuant to Section 1B1.3:

Prior to 2015, co-defendants and brothers, Hisham Mutan, Mohammed Almuttan, Rami Almuttan, and Saddam Mutan (Almuttan brothers), purchased and began operating numerous gas stations and convenience stores throughout St. Louis City and St. Louis County in the Eastern District of Missouri. Beginning prior to 2015, the Almuttan brothers began to sell smokeable synthetic drugs from their stores for profit. These drugs included synthetic cathinones and cannabinoids. Sometime prior to September of 2015, the defendant, ~~Zanial Saleh~~, Zainalqul ZS began to work for the Almuttan brothers. The defendant had several duties for the Almuttan brothers' businesses including working as clerk and on-site manager at Hazelwood Discount Cigarettes at 6950 North Hanley, Hazelwood, Missouri in St. Louis County in the Eastern District of Missouri (Hazelwood Discount). Under the direction of the Almuttan brothers, the defendant sold smokable synthetic drugs from Hazelwood Discount to customers and users.

In Late 2015, the St. Louis City Police Department (SLMPD) and the Drug Enforcement Administration (DEA) began to investigate the Almuttan brothers' business for the sale of synthetic drugs. Throughout late 2015 and 2016, investigators conducted numerous controlled purchases of packets of synthetic drugs from the Almuttan brothers' stores including Hazelwood Discount, Kenyes Market at 5477 North Kingshighway in St. Louis, MO (Kenyes), Northway Market at 5590 North Florissant Blvd. in St. Louis, MO (Northway), and the Phillips 66 gas station

3

at 2800 North Florissant Blvd. in St. Louis, MO (Phillips 66). The controlled purchases conducted at Hazelwood Discount with the defendant are as follows:

a.    On September 29, 2015, a DEA confidential source (DEA CS) entered Hazelwood Discount and asked the defendant, who was working behind the store's counter, to purchase several packets of synthetic drugs labeled "Bob Marley." The DEA CS paid $70.00 in United States currency to the defendant who then handed the packets of "Bob Marley" brand synthetic drugs to the DEA CS. The DEA CS exited the store and turned the packets of drugs over to investigators. Later lab analysis of the smokeable material inside of the packets quantified the substances as 12.0 grams containing 5F-AMB.[1]   At the time the defendant sold the 5F-AMB to the DEA CS, the defendant was aware of the illegal nature of the smokable synthetic drugs, knew it was intended for human consumption by smoking, and knew it would give the user a "high" when inhaled, ingested or injected.

b.    On October 1, 2015, an undercover DEA investigator entered Hazelwood Discount and asked the defendant, again behind the counter, to purchase several packets of synthetic drugs labeled "Bob Marley." The undercover investigator paid the $70.00 in US currency to the defendant who then handed the packets of "Bob Marley" brand synthetic drugs to the undercover investigator. Later lab analysis of the smokeable material inside of the packets quantified the substances as 8.9 grams containing 5F-AMB. At the time the defendant sold the 5F-AMB to the undercover investigator, the defendant was aware of the illegal nature of the smokable synthetic

---

[1] According to DEA expert chemists and pharmacologists, 5F-AMB is an analogue of the schedule I controlled substance ADB-PINACA, and when intended for human consumption meets the definition of a schedule I controlled substance under Title 21, United State Code, Section 813. ADB-PINACA was scheduled as a schedule I controlled substance in the Controlled Substance Act on February 10, 2014.

drugs, knew it was intended for human consumption by smoking, and knew it gave the user a "high" when inhaled, ingested or injected.

On June 30, 2016, the DEA and SLMPD executed a search warrant on Northway. Approximately 150 multi-gram packets of smokable synthetic drugs were recovered. During this time, investigators learned that throughout 2015 and early 2016, the Almuttan brothers were ordering and receiving their supply of pre-packaged, synthetic drug packets from sources of supply in Chicago, New Jersey, and elsewhere.

In addition to receiving packaged synthetic drugs from suppliers around the United States, in middle to late 2016, the Almuttan brothers and co-defendant Saad Al Mallak (Al Mallak) began to manufacture kilogram quantities of their own smokable synthetic drugs at the Almuttan brothers' rural property at 7366 Browns Ford Rd. in Dittmer, MO (Dittmer Farm). On November 18, 2016, HSI investigators intercepted a parcel inbound from China and addressed to Al Mallak at the Dittmer Farm containing approximately 1 kilogram of synthetic drug powder that was determined to be a chemical known as FUB-AMB.[2] Al Mallak and others would receive the raw chemical powder from China. At the Dittmer Farm, Al Mallak or others would liquefy the chemical in a solvent such as acetone or Everclear alcohol. That solution was then sprayed on inert but smokable vegetable substances such as Damiana or Marshmallow leaf. Once the product dried, it would be packaged in bulk for delivery by Al Mallak or others to other members of the conspiracy for individual packaging and sale. In addition to the stores and the Dittmer Farm, the Almuttan brothers also owned a residence at 10147 Imperial Drive in St. Louis County, MO.

---

[2] According to DEA expert chemists and pharmacologists, FUB-AMB is an analogue of the schedule I controlled substance AB-FUBINACA, and when intended for human consumption meets the definition of a schedule I controlled substance under Title 21, United State Code, Section 813. AB-FUBINACA was scheduled as a schedule I controlled substance in the Controlled Substance Act on February 10, 2014.

Basem Hamdan (Hamdan) lived at that residence. Al Mallak or other co-conspirators would then transport the bulk smokable synthetic drugs to Hamdan's residence, where Hamdan, Talal Abuajaj (Abuajaj) and others would store the synthetic drugs and package them for individual sale by the defendant, Mahajir Naz, Hasan Abdelatif, and others from the various Almuttan brothers' stores.

From November of 2016 to May of 2017, investigators applied for and received numerous Title III intercept authorizations from the United States District Court in the Eastern District of Missouri. Investigators monitored the cellular telephones of Mohammed Almuttan, Rami Almuttan, Saddam Mutan, and Hisham Mutan. Throughout the interception periods, investigators intercepted numerous calls from the Almuttan brothers to numerous co-conspirators in the St. Louis area, Chicago, IL and New Jersey. In March and April of 2017, investigators intercepted numerous calls between Rami Almuttan and the defendant discussing the re-supply of Hazelwood Discount with synthetic drugs and the sale of those synthetic drugs to customers. In one instance on March 17, 2017, the defendant informed Rami Almuttan that he had sold all the "large" packets (10 gram packets of synthetic drugs) and needed more. The defendant stated that he still had an inventory of the "small" packets (4 gram packets of synthetic drugs,) and the "small" packets were selling well. In another instance, on March 18, 2017, the defendant and Rami Almuttan discussed a quantity of synthetic drugs that were prepared and ready for the defendant to pick up from Northway and take them back to Hazelwood Discount to be sold. During these conversations, the defendant was aware of the illegal nature of the smokable synthetic drugs, knew they were intended for human consumption by smoking, and knew they gave the user a "high" when inhaled, ingested or injected.

Throughout the interception period of calls to and from Rami Almuttan's cellular telephone from February 2, 2017 until May 27, 2017, Rami Almuttan and the defendant discussed numerous

6

re-supply shipments of synthetic drugs to Hazelwood Discount. Throughout this time, the defendant informed Rami Almuttan when the defendant began to sell out of the synthetic drug inventory. Rami Almuttan would then direct another co-conspirator to deliver a re-supply of the synthetic drugs. The defendant would then follow the directions of Rami Almuttan or the other Almuttan/Mutan brothers and sell the synthetic drugs to customers from the counter of the Hazelwood Discount store. The defendant remained aware of the illegal nature of the smokable synthetic drugs, knew they were intended for human consumption by smoking, and knew they gave the user a "high" when inhaled, ingested or injected.

On May 23, 2017, DEA and HSI investigators conducted a series of search warrants on the Almuttan brothers' businesses, residences, and other properties involved in the conspiracy including Hazelwood Discount. Although the defendant was not present at Hazelwood Discount at the time of search warrant execution, the cellular intercepts illustrate the defendant knew that he was responsible for maintaining the inventory of synthetic drugs at Hazelwood Discount. During the execution the search warrant on Hazelwood Discount, investigators located and seized 38 packets of "7H Hydro" each weighing 4 grams and 17 packets of "Get Real" each weighing 5 grams. The total weight of synthetic drugs recovered on May 23, 2017 was 237 grams. The defendant admits that he was responsible for the sale of the synthetic drugs that were located by investigators in Hazelwood Discount on May 23, 2017. Further, the defendant was aware those drugs were illegal, knew they were intended for human consumption by smoking, and knew they gave the user a "high" when inhaled, ingested or injected.

The amount of controlled substances and/or analogue controlled substances, in light of the known evidence, cellular telephone interceptions, and seizures, attributable to defendant is not subject to precise calculation. Further, as of the scheduled guilty plea date, the Government

7

laboratories have not been able to analyze fully all of the controlled substances and/or analogue controlled substances located on May 23, 2017 at Hazelwood Discount. Therefore, the parties have agreed the defendant is accountable for the following:

a)   20.9 grams of 5F-AMB, the defendant sold to the DEA CS on September 29, 2015 and the undercover investigator on October 1, 2015 at Hazelwood Discount; and

b)   237 grams of synthetic cannabinoids, a controlled substance and/or analogue controlled substance, recovered at Hazelwood Discount during the May 23, 2017 search warrant.

Further, the defendant admits that he was aware that the 257.9 grams is accountable for were controlled substances and/or analogue controlled substances intended for human consumption. The defendant admits he knew the analogue controlled substances had the following traits: a) they had the same or substantially similar chemical structure and pharmacological effects as schedule I controlled substances; and they were intended for human consumption to provide the user with a "high."

## 5. STATUTORY PENALTIES:

### a. Count II:

The defendant fully understands that the maximum possible penalty provided by law for the crime to which the defendant is pleading guilty is imprisonment of not more than twenty years, a fine of not more than $1,000,000, or both such imprisonment and fine. The Court shall also impose a period of supervised release of at least three years.

## 6. U.S. SENTENCING GUIDELINES: 2018 MANUAL:

The defendant understands that this offense is affected by the United States Sentencing Guidelines (U.S.S.G.) and the actual sentencing range is determined by both the Total Offense Level and the Criminal History Category. The parties agree that the following are the U.S.S.G. Total Offense Level provisions that apply:

### a. Chapter 2 Offense Conduct:

(1) **Base Offense Level:**     The parties agree that the quantity of controlled substances and/or analogue controlled substances for which defendant is accountable, including relevant conduct, is 257.9 grams of synthetic cannabinoids. The parties also agree that when converted under the U.S.S.G. drug equivalency tables in Application Note 8(D) of U.S.S.G. §2D1.1 at the ratio of 1 gram of synthetic cannabinoid to 167 grams of marijuana, the defendant is accountable for 43.07 kilograms of marijuana, or between 40 kilograms and 60 kilograms of marijuana. This results in a level of 18 pursuant to U.S.S.G. §2D1.1(c)(11).

(2) **Chapter 2 Specific Offense Characteristics**: The parties recommend that the following Specific Offense Characteristics may not or may apply:

(a.) **Safety Valve**: The parties have agreed that a two level reduction pursuant to Section 2D1.1(b)(17) would be appropriate if the defendant otherwise meets the criteria set forth in Section 5C1.2. Based upon the information presently known, the parties recommend that the defendant meets the criteria set forth in Section 5C1.2(a)(2), (3), and (4). Defendant has not yet satisfied the requirement contained in Section 5C1.2(a)(5), but has indicated a desire to do so. If and when defendant satisfies the requirement in subsection (5), the parties shall notify the Probation Officer as soon as practicable. Whether the defendant meets the criteria set forth in Section 5C1.2(a)(1), relating to the defendant's criminal history, is left to the

9

determination of the Court as stated in paragraph 6(e) herein. **Defendant understands that he must meet all five criteria contained in Section 5C1.2 in order to receive the two-level reduction under Section 2D1.1(b)(17).**

**b. Chapter 3 Adjustments**: The parties are unaware of any applicable Chapter 3 Adjustments, other than minor role adjustment and acceptance of responsibility.

**(1) Minor Role Adjustment:** The parties recommend that two levels should be deducted pursuant to U.S.S.G. §3B1.2(b) in the defendant was minor participant.

**(2) Acceptance of Responsibility**: The parties recommend that two levels should be deducted pursuant to §3E1.1(a), because the defendant has clearly demonstrated acceptance of responsibility.

**c. Other Adjustments and Disputed Adjustments:** None.

**d. Estimated Total Offense Level:** The parties estimate the Total Offense Level is 14. If the Court elects to apply the safety valve, the Total Offense Level would be 12.

**e. Criminal History:** The determination of the defendant's Criminal History Category shall be left to the Court. Either party may challenge, before and at sentencing, the finding of the Presentence Report as to the defendant's criminal history and the applicable category. The defendant's criminal history is known to the defendant and is substantially available in the Pretrial Services Report.

**f. Effect of the Parties' U.S. Sentencing Guidelines Analysis:** The parties agree that the Court is not bound by the Guidelines analysis agreed to herein. The parties may not have foreseen all applicable Guidelines. The Court may, in its discretion, apply or not apply any Guideline

despite the agreement herein and the parties shall not be permitted to withdraw from the plea agreement.

## 7. WAIVER OF APPEAL AND POST-CONVICTION RIGHTS:

**a. Appeal:** The defendant has been fully apprised by defense counsel of the defendant's rights concerning appeal and fully understands the right to appeal the sentence under Title 18, United States Code, Section 3742.

**(1) Non-Sentencing Issues:** The parties waive all rights to appeal all non-jurisdictional, non-sentencing issues, including, but not limited to, any issues relating to pretrial motions, discovery and the guilty plea.

**(2) Sentencing Issues:** In the event the Court accepts the plea, accepts the U.S. Sentencing Guidelines Total Offense Level agreed to herein, and, after determining a Sentencing Guidelines range, sentences the defendant within or below that range, then, as part of this agreement, the defendant hereby waives all rights to appeal all sentencing issues other than Criminal History. Similarly, the USAO hereby waives all rights to appeal all sentencing issues other than Criminal History, provided the Court accepts the plea, the agreed Total Offense Level and sentences the defendant within or above that range.

**b. Habeas Corpus:** The defendant agrees to waive all rights to contest the conviction or sentence in any post-conviction proceeding, including one pursuant to Title 28, United States Code, Section 2255, except for claims of prosecutorial misconduct or ineffective assistance of counsel.

**c. Right to Records:** The defendant waives all rights, whether asserted directly or by a representative, to request from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including any records that may be sought

11

under the Freedom of Information Act, Title 5, United States Code, Section 522, or the Privacy Act, Title 5, United States Code, Section 552(a).

**8. OTHER:**

**a.  Disclosures Required by the United States Probation Office:**  The defendant agrees to truthfully complete and sign forms as required by the United States Probation Office prior to sentencing and consents to the release of these forms and any supporting documentation by the United States Probation Office to the USAO.

**b.   Civil or Administrative Actions not Barred; Effect on Other Governmental Agencies:**

Nothing contained herein limits the rights and authority of the United States to take any civil, tax, immigration/deportation or administrative action against the defendant.

**c.  Supervised Release:**  Pursuant to any supervised release term, the Court will impose standard conditions upon the defendant and may impose special conditions related to the crime defendant committed.   These conditions will be restrictions on the defendant to which the defendant will be required to adhere.  Violation of the conditions of supervised release resulting in revocation may require the defendant to serve a term of imprisonment equal to the length of the term of supervised release, but not greater than the term set forth in Title 18, United States Code, Section 3583(e)(3), without credit for the time served after release.  The defendant understands that parole has been abolished.

**d.  Mandatory Special Assessment:**  Pursuant to Title 18, United States Code, Section 3013, the Court is required to impose a mandatory special assessment of $100 per count for a total of $100, which the defendant agrees to pay at the time of sentencing. Money paid by the defendant

12

toward any restitution or fine imposed by the Court shall be first used to pay any unpaid mandatory special assessment.

**e.   Possibility of Detention:**   The defendant may be subject to immediate detention pursuant to the provisions of Title 18, United States Code, Section 3143.

**f.   Fines, Restitution, and Costs of Incarceration and Supervision:**   The Court may impose a fine, costs of incarceration and costs of supervision.  The defendant agrees that any fine imposed by the Court will be due and payable immediately.

**g.   Forfeiture:**   The defendant agrees to forfeit all of the defendant's interest in all items seized by law-enforcement officials during the course of their investigation.  The defendant admits that all United States currency, weapons, property, and assets seized by law enforcement officials during their investigation constitute the proceeds of the defendant's illegal activity, were commingled with illegal proceeds, or were used to facilitate the illegal activity.  The defendant agrees to execute any documents and take all steps needed to transfer title or ownership of said items to the USAO and to rebut the claims of nominees and/or alleged third party owners.  The defendant agrees that said items may be disposed of by law enforcement officials in any manner.

## 9.  ACKNOWLEDGMENT AND WAIVER OF THE DEFENDANT'S RIGHTS:

In pleading guilty, the defendant acknowledges, fully understands and hereby waives his rights, including but not limited to: the right to plead not guilty to the charges; the right to be tried by a jury in a public and speedy trial; the right to file pretrial motions, including motions to suppress or exclude evidence; the right at such trial to a presumption of innocence; the right to require the USAO to prove the elements of the offenses charged against the defendant beyond a reasonable doubt; the right not to testify; the right not to present any evidence; the right to be protected from compelled self-incrimination; the right at trial to confront and cross-examine

13

adverse witnesses; the right to testify and present evidence and the right to compel the attendance of witnesses. The defendant further understands that by this guilty plea, the defendant expressly waives all the rights set forth in this paragraph.

The defendant fully understands that the defendant has the right to be represented by counsel, and if necessary, to have the Court appoint counsel at trial and at every other stage of the proceeding. The defendant's counsel has explained these rights and the consequences of the waiver of these rights. The defendant fully understands that, as a result of the guilty plea, no trial will, in fact, occur and that the only action remaining to be taken in this case is the imposition of the sentence.

The defendant is fully satisfied with the representation received from defense counsel. The defendant has reviewed the USAO's evidence and discussed the USAO's case and all possible defenses and defense witnesses with defense counsel. Defense counsel has completely and satisfactorily explored all areas which the defendant has requested relative to the USAO's case and any defenses.

## 10. VOLUNTARY NATURE OF THE GUILTY PLEA AND PLEA AGREEMENT:

This document constitutes the entire agreement between the defendant and the USAO, and no other promises or inducements have been made, directly or indirectly, by any agent of the United States government, including any Department of Justice attorney, concerning any plea to be entered in this case. In addition, the defendant states that no person has, directly or indirectly, threatened or coerced the defendant to do or refrain from doing anything in connection with any aspect of this case, including entering a plea of guilty.

The defendant acknowledges having voluntarily entered into both the plea agreement and the guilty plea. The defendant further acknowledges that this guilty plea is made of the defendant's own free will and that the defendant is, in fact, guilty.

## 11. CONSEQUENCES OF POST-PLEA MISCONDUCT:

After pleading guilty and before sentencing, if defendant commits any crime, other than minor traffic offenses, violates any conditions of release that results in revocation, violates any term of this guilty-plea agreement, intentionally provides misleading, incomplete or untruthful information to the U.S. Probation Office or fails to appear for sentencing, the United States, at its option, may be released from its obligations under this agreement. The USAO may also, in its discretion, proceed with this agreement and may advocate for any sentencing position supported by the facts, including but not limited to obstruction of justice and denial of acceptance of responsibility.

## 12. NO RIGHT TO WITHDRAW GUILTY PLEA:

Pursuant to Rule 11(c) and (d), Federal Rules of Criminal Procedure, the defendant understands that there will be no right to withdraw the plea entered under this agreement, except where the Court rejects those portions of the plea agreement which deal with charges the USAO agrees to dismiss or not to bring.

4/4/22
Date

4-4-22
Date

JOHN R. MANTOVANI, #50867MO
Assistant United States Attorney

ZAINAL ZOHAL SALEH
Defendant

15

4- 4- 22
_____
Date

_____
JOSEPH NEILL
Attorney for Defendant